**CAREFIRST OF MARYLAND, INC. d/b/a CareFirst Blue Cross Blue Shield, Plaintiff,**

v.

**FIRST CARE, P.C., Defendants.**

**No. CIV.A. 2:04CV191.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 2, 2004.

Duane Michael Byers, Nixon & Vanderhye PC, Arlington, VA, Brian Nelson Casey, Taylor & Walker PC, Norfolk, VA, Louis Edward Dolan, Jr., Nixon Peabody LLP, Washington, DC, Jason Charles Kravitz, Nixon Peabody LLP, Boston, MA, Kristin Dulong Kuperstein, Nixon Peabody LLP, Boston, MA, for defendant.

Christopher M. Collins, Stevens Davis Miller & Mosher LLP, Washington, DC, Andrew Gerard Howell, Williams Mullen, Virginia Beach, VA, Craig Lawrence My-

telka, Williams Mullen, Virginia Beach, VA, for plaintiff.

## MEMORANDUM OPINION & ORDER

DOUMAR, District Judge.

Presently before the Court are two motions for summary judgment, one filed by Defendants First Care, P.C. ("Defendant First Care"), and the other filed by Plaintiff CareFirst of Maryland, Inc., which does business as CareFirst Blue Cross Blue Shield ("Plaintiff CareFirst"), and an objection to an order by the Magistrate Judge allowing Defendant First Care leave to amend on October 15, 2004 to file a counterclaim. In spite of the fact that the attorneys have endeavored mightily to complicate this matter, this is a straightforward trademark infringement case that boils down to a simple question: whether a doctors' office use of the name "First Care" is likely to cause confusion with an insurance company's "CareFirst" mark. It does not and therefore the Court **GRANTS** Defendant First Care's motion for summary judgment. Plaintiff Care-First's motion for summary judgment is **DENIED**. Leave to amend granted by the Magistrate Judge on October 15, 2004 is hereby **REVERSED** and leave to amend is **DENIED**.

## I. Facts and Procedural Background

### A. Facts

Plaintiff CareFirst, an independent licensee of the Blue Cross Blue Shield Association, is a health care insurer with 3.2 million members residing in 50 states. Most of Plaintiff CareFirst's membership, approximately 80%, resides in the mid-Atlantic region. More than 230,000 of its members reside within the Commonwealth of Virginia and, of that number, approximately 2,500 members reside in the areas including Portsmouth, Chesapeake, and

Norfolk. *See* Pl.'s Mot. for Summ. J. at Ex. 2. According to Plaintiff CareFirst, "membership in CareFirst entitles each member to payment for emergency healthcare anywhere in the world and to non-emergency health care upon prior notification and approval by the respective health care provided organization owned by the CareFirst Organization. Membership in any one of the CareFirst health maintenance or preferred provider organizations is honored by most health care facilities in the United States provided that the member notifies CareFirst and an appropriate claim is filed." Pl.'s Compl. at 7, ¶ 21. A member must present his CareFirst membership card in order to obtain payment. *Id.* CareFirst is first and foremost an insurer.

Plaintiff CareFirst owns three "Care-First" marks at issue in this case, namely, a collective membership mark, a service mark, and a trademark. It owns the federal collective membership mark "CARE-FIRST" for:

> Indicating membership in an organization of persons and medical providers interested in health maintenance, preventive medicine, prepaid medical plans, reduced health costs, and programs on fitness, prenatal care, substance abuse, and other health-related topics . . . .

*See id.* at Ex. A (U.S. Collective Membership Registration No. 1,545,100 dated June 6, 1989). Plaintiff CareFirst owns the federal service *and* trademark marks "CA-REFIRST" for:

> Newsletters pertaining to health care, medical care, and membership services . . . underwriting and administration services, on a prepayment basis, relating to emergency medical care; prepaid financing and administration of medical care, pharmaceutical care and related health care services . . . educational services . . . health care services in the

nature of a health maintenance organization; consulting services in connection therewith; selecting health care services at reduced costs to participating members so as to contain health care costs; rehabilitation services for disabled persons; organizational services, namely, protecting the interests of persons concerned with personal health maintenance and safety.

*See id.* at Ex. B and C (U.S. Trademark Serve Mark Principal Register No. 1,546,-326 dated July 4, 1989). According to Plaintiff CareFirst, during the period from 1996 through the first quarter of 2004, it spent $54,500,000 on various forms of advertising involving the CareFirst mark. *See id.* at Ex. C and Ex. D. Plaintiff CareFirst advertises in nationwide publications such as *The Baltimore Sun, The Washington Post, Time, Newsweek,* and *U.S. News and World Report. See* Compl. at 8. The company also promotes itself on billboards on major highways and signs within mass transit facilities. *See id.*

Ms. Ann Gallant, CareFirst's Vice President of Corporate Communications, *see id.* at Ex. 3, testified that the mark "CareFirst" is not marketed by itself; rather, when the company communicates "to consumers and the general public" the mark is always accompanied by "Blue Cross Blue Shield." *See* Def.'s Mot. for Summ. J. at Ex. 8, p. 115 (Gallant deposition). According to Ms. Gallant, the company takes their policy of always including "Blue Cross Blue Shield" along with the CareFirst mark "very seriously" because "Blue Cross Blue Shield is the most trusted brand in healthcare." *See id.* at 117–18. Consequently, all marketing materials and provider directories use the text of the company's entire name, which is "CareFirst Blue Cross Blue Shield." *See id.;* see also. Pl.'s Mot. for Summ. J. at Ex. 15 (internal corporate memorandum indicating the same). In addition, the symbols of

a blue cross and a blue shield always accompany the CareFirst Blue Shield Blue Cross logo. *See id.*

Defendant First Care consists of eleven family practice physicians who practice in Portsmouth and Chesapeake, Virginia. They have about 5,000 patient visits per month. *See* Pl.'s Mot. for Summ. J. at Ex. 7. The group registered its corporate name (First Care, P.C.) with the Commonwealth of Virginia in October 1994, and has used First Care to identify their practice since about March 1995. *See* Defs.' Mot. for Summ. J. at Ex. 2. First Care spends approximately $1,845 annually on advertising and promotional materials. *See* Pl.'s Mot. for Sum. J. at Ex. B. The group uses signs in front of its offices, the local telephone directory, and new physician announcements in the local newspaper to promote itself. *See id.* at Ex. 5 (Dajao declaration). It is first and foremost a doctors' office.

Like a lot of doctors' offices, the First Care group accepts some form of Blue Cross Blue Shield insurance. In Defendant First Care's case, its Blue Cross Blue Shield licensee is Anthem Blue Cross Blue Shield. *See id.* at Ex. E, p. 123–24. First Care never pairs its name with either the mark "CareFirst" or "Blue Cross Blue Shield." The name typically appears as "First Care, P.C." without any other marks, symbols, or colors other than black and white. *See* Pl.'s Mot. for Summ. J. at Ex. 13. In fact, CareFirst has paid First Care for providing doctor's care to CareFirst insureds.

## B. Procedural History

On March 19, 2004, Plaintiff CareFirst sued Defendant First Care for trademark infringement and dilution of its federally registered CareFirst mark, requesting injunctive relief preventing First Care from

using the mark and an award of First Care's profits in the amount of $27,937,390. Defendant First Care answered on April 22, 2004, denying the allegations and submitting several affirmative defenses. A scheduling order was issued on May 26, 2004. A series of contentious discovery disputes began in July.[1]

With respect to the discovery disputes, on October 26, 2004, this Court held a hearing to consider Plaintiff CareFirst's objections to three of Magistrate Judge F. Bradford Stillman's discovery orders. The Court also considered Defendant First Care's Motion *in Limine* to Preclude Testimony of Myron J. Helfgott, Ph.D., an expert witness for Plaintiff CareFirst. Ultimately, Plaintiff's three objections concerned the extent to which it had to produce trademark reports generated in an anticipation of litigation. This Court sustained Magistrate Judge Stillman's orders in part, determining that the Magistrate Judge's orders were not clearly erroneous[2] with respect to his conclusions that Plaintiff CareFirst had engaged in dilatory tactics and that Plaintiff CareFirst was required to produce, for the purposes of discovery only, trademark search reports generated in an anticipation of litigation from 1995, the year Defendant First Care began conducting business, to the present.

This Court overruled Magistrate Judge Stillman's orders to the extent that they required Plaintiff CareFirst to produce such documents generated *prior* to 1995. In addition, the Court denied Defendant First Care's motion *in limine*.[3]

■ Meanwhile, in the midst of these disputes, Defendant First Care filed a motion to amend its answer on September 9, 2004, in order to assert counterclaims for fraud, abandonment, and cancellation against Plaintiff CareFirst. On October 15, 2004, Magistrate Judge Stillman held a hearing on the motion and granted Defendant First Care's leave to amend. This Court **REVERSES** Judge Stillman's order. The order allowing leave to amend to file a counterclaim was issued on October 15, 2004, and, at this point, Defendant First Care had already filed a motion for summary judgment, the trial was set only three weeks later, and the final pre-trial conference with the presiding judge was set on October 26, 2004, at a time when CareFirst had just answered the counterclaim on October 22, 2004. The Court therefore is not inclined to consider new issues in this case that will inevitably require new discovery at such a late date.

Defendant First Care's Motion for Summary Judgment was filed on October 7,

---

1. In one of the many Discovery Orders Magistrate Judge F. Bradford Stillman was required to issue because of the parties' inability to cooperate, he determined that Plaintiff CareFirst had demonstrated a propensity for "engaging in dilatory tactics which have, to some degree, prejudiced the defendants." *See* August 13, 2004 Disc. Order at 5. On October 15, 2004, Magistrate Judge Stillman again admonished Plaintiff CareFirst for its undue delay. On October 26, 2004, he sanctioned Plaintiff CareFirst for, *inter alia*, not complying with his August 13 Order requiring Plaintiff to disclose awareness of third-party use and for failing to timely file an adequate privilege log.

2. Pursuant to Fed.R.Civ.P. 72(a), the Court may set aside a magistrate judge's order if it is clearly erroneous or contrary to the law. A finding is clearly erroneous only "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that an error has been committed." *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

3. Although the Court denied Defendant First Care's motion in limine, it appreciates Defendant First Care's many concerns about Dr. Helfgott's survey. The Court discusses the survey *infra*.

2004. Plaintiff CareFirst then filed its own Motion for Summary Judgment on October 19, 2004. Both parties have filed their oppositions to the respective motions.

## II. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court views the facts in the light most favorable to the nonmoving party. *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991). The moving party has the threshold burden of informing the court of the basis of the motion, of establishing that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992).

Once the moving party satisfies this threshold showing under Rule 56(c), the burden of production, not persuasion, shifts to the non-moving party. *Id.* at 322–23, 106 S.Ct. 2548. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548; *see also* Fed. R.Civ.P. 56(e); *Catawba Indian Tribe*, 978 F.2d at 1339. "The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Lee*, 943 F.2d at 368.

## III. Discussion

Defendant First Care moves this Court to enter summary judgment as a matter of law because Plaintiff CareFirst's claims are barred by the equitable doctrine of estoppel by laches. In addition, Defendant First Care argues it is entitled to summary judgment because Plaintiff CareFirst's trademark infringement claims fail for the following reasons: the absence of any evidence of actual confusion after nine years of co-existence creates a presumption of no confusion in the future; the CareFirst mark is weak because of extensive third-party use; the marks are not similar when encountered by consumers; the CareFirst mark is always accompanied by the well-known Blue Cross Blue Shield marks and logos; CareFirst and First Care offer very different services, have different facilities, and do not advertise in the same or similar media; consumers exercise great care before selecting medical services or health insurance; and First Care selected its name in good faith. Finally, Defendant First Care maintains that Plaintiff CareFirst's dilution claim fails as well because CareFirst was not "famous and distinctive" in 1995 when First Care began using the mark and Plaintiff CareFirst has not introduced evidence that First Care's use of the mark has caused actual dilution.

Plaintiff CareFirst also moves this Court to enter summary judgment with respect to its claim that First Care infringed upon

its collective membership mark.[4] In its motion, Plaintiff CareFirst maintains it has met the legal standard for infringement because it had established in an unrelated proceeding before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office (TTAB) that the mirror-image of CareFirst—First Care—was apt to create a likelihood of confusion in connection with "pre-paid medical plans." Plaintiff CareFirst also supports its motion by pointing to a survey conducted by its expert, Dr. Myron Helfgott, showing that the likelihood of confusion existed because of Defendant First Care's use of the mark. In addition, Plaintiff CareFirst argues that the similarities between the marks are obvious in terms of sight, sound, and meaning; CareFirst's services are very similar to First Care's services because its organization includes medical providers; the "facility" test does not illuminate confusion when it comes to confusion among members of a collective organization; First Care's advertising is likely to lead CareFirst members to conclude that CareFirst approved of First Care's activities; and, finally, First Care has evidenced bad faith because it continued to use the mark after CareFirst asked it to cease and desist.

## A. Trademark Infringement

Under the Lanham Act, plaintiffs must satisfy a two prong test in order to prevail on a claim for trademark infringement and unfair competition.[5] *See* 15 U.S.C. §§ 1114(1) and 1125. The plaintiff must "first and most fundamentally prove that it has a valid and protectable mark."

*U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir.2002) (citation omitted). If the plaintiff's mark is protectable, it must then show that "defendant's use of an identical or similar mark is likely to cause confusion among consumers." *Id.* Virginia's common law test for unfair competition is essentially the same. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 n. 10 (4th Cir.1995).

With respect to a mark's protectability, the United States Court of Appeals for the Fourth Circuit has held that a certificate of registration issued by the Patent and Trademark Office is *prima facie* evidence of the mark's validity and registration, the registrant's ownership, and "the registrant's 'exclusive right' to use the mark on or in connection with the goods and services specified in the certificate of registration." *U.S. Search*, 300 F.3d at 524; *see also* 15 U.S.C. § 1115(b). A registrant's right to use a mark becomes incontestable after five years of continuous and unchallenged use. 15 U.S.C. § 1065 and 1115(b). In this case, there is little question that "CareFirst" as originally registered by the Plaintiff in 1989 is an incontestable collective membership, service, and trademark mark.

It is the second prong of the test, likelihood of confusion, that is contested in this case. With respect to this prong, the analysis turns on whether the use is "likely" "to cause confusion, or to cause mistake, or to deceive" the ordinary consumer. 15 U.S.C. § 1114(1); *Lone Star*, 43 F.3d at

---

4. In its Complaint, Plaintiff CareFirst alleged infringement of its CareFirst service mark, its CareFirst trademark, and its CareFirst collective membership mark. Plaintiff CareFirst's Motion for Summary Judgment is based upon its claim that Defendant First Care violated its collective membership mark only.

5. For the purposes of Defendant First Care's Motion for Summary Judgment, all of Plaintiff CareFirst's marks are at issue. For the purposes of Plaintiff's Motion for Summary Judgment, however, only the collective membership mark is at issue.

933. Actual confusion is not required; rather, courts should consider the following factors: "(1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the advertising the two parties use; (6) the defendant's intent; and (7) actual confusion." *Id.* "The factors are not of equal importance or equal relevance in every case." *Petro Stopping Centers, L.P. v. James River Petroleum,* 130 F.3d 88, 91 (1997).

■ With respect to the first factor, the mark's distinctiveness is directly related to the strength of the mark. *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 464 (4th Cir.1996). Courts begin their analysis of the strength and distinctiveness of a mark by first categorizing the mark as "fanciful," "arbitrary," "suggestive," "descriptive," or "generic." *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 464 (4th Cir.1996). "Fanciful" marks—made-up marks such as "Clorox" or "Exxon"—are highly distinctive and thus receive the most protection. "Arbitrary" marks receive somewhat less protection. They consist of real words in common usage, but do not describe the product they serve in any real sense. "Apple" computers is an example of an arbitrary mark. *Id.* "Suggestive" marks receive even less protection. They "connote, but do not describe, some quality, ingredient, or characteristic of the product," but a person would be unlikely to identify the product without actual knowledge of what it is. *Id.* "Coppertone" suntan lotion is an example of a suggestive mark. "Descriptive" marks function exactly as their name implies and only receive protection if they have acquired a "secondary meaning." *Id.* "Generic" terms may never be used as trademarks.

The Court **FINDS** that CareFirst is a suggestive mark deserving some trademark protection. The United States Patent and Trademark Office approved the registration of the CareFirst mark without requiring proof of secondary meaning, indicating that the PTO has concluded that the mark is not "merely descriptive but suggestive." *See Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1529 (1984). In addition, the word "care" is commonly associated with the healthcare field, *see Stafford Urgent Care, Inc. v. Garrisonville Urgent Care, P.C.,* 224 F.Supp.2d 1062, 1065 (E.D.Va.2002), and thus CareFirst connotes some kind of health-related service or product, although consumers would be unlikely to identify the service or product without actual knowledge of it.

The analysis does not stop, however, at the conclusion that CareFirst is a suggestive mark. As the United States Court of Appeals for the Fourth Circuit has pointed out, "the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of the mark for purposes of the likelihood of confusion test." *Petro Stopping,* 130 F.3d at 93. Because the strength of a mark "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source," courts must also examine third-party use, consumer confusion, and "the extent of secondary meaning a mark has acquired in the eyes of consumers." *Id.*

In this case, substantial evidence exists in the record showing that considerable numbers of third-parties use either the names CareFirst or First Care. Defendant First Care submitted testimony from twelve different third-parties actively using one of these marks; introduced evidence of at least seventy-five third-parties presently using one of the marks; and introduced evidence of forty third-parties

that appear to be presently using one of the marks based on websites, phone listings, and state filings. *See* Def.'s Mot. for Sum. J. (Crowley Declaration). In addition, Defendant First Care submitted two trademark search reports generated by Thomson & Thomson, a vendor specializing in trademark searches.[6] These reports reveal that the First Care's name appears in the names of more than 100 businesses. *See id.* at Ex. 3 (referring to the 1996 and 2000 reports). All of these documents reveal a variety of healthcare-related businesses—from physicians to surgeons to acupuncturists—using either First Care or CareFirst in their names. Numerous users of a mark strongly indicates a weak mark. *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.* 33 F.Supp.2d 488, 494 (E.D.Va.1999).

As to "the extent of secondary meaning a mark has acquired in the eyes of consumers," the CareFirst mark has no secondary meaning at all. Establishing secondary meaning requires a showing that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 (4th Cir.1990). Coca-cola is a primary example of a product that has acquired secondary meaning in the public's mind. *See Sara Lee*, 81 F.3d at 464. In no way has CareFirst shown—nor did it attempt to show—that it has acquired a secondary meaning so that the public, upon encountering its name, mentally associates the

mark as the primary source of health insurance. *Id.* (quoting J. McCarthy, Trademarks and Unfair Competition, § 15.2 at 659, which states that "[t]he prime element of secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product.").

Moreover, for the purposes of showing the weakness of the mark, Plaintiff CareFirst offers no evidence of consumers actually confusing the CareFirst and First Care marks.[7] *Compare Lyons*, 243 F.3d at 802 (where the plaintiff introduced testimony and newspaper clippings revealing actual confusion); *with Lone Star*, 43 F.3d at 937 (where the plaintiffs produced affidavits, declarations, and deposition testimony providing evidence that customers had confused two restaurants having "Lone Star" in their names); *and Sara Lee*, 81 F.3d at 466 (observing that the record was "replete with anecdotal evidence of consumers throughout the nation" confusing two products and included testimony that store clerks had shelved the two products incorrectly in addition to finding the confusion survey persuasive). For all of these reasons, the Court therefore **FINDS** that CareFirst cannot meet the first factor and is a relatively weak and indistinctive mark.

With respect to the second factor, the similarity of the two marks, the test is "whether there exists a similarity in appearance and sound which would result in confusion." *Petro Stopping*, 130 F.3d at 94. Clearly, the marks CareFirst and

---

**6.** In *Petro Stopping Centers, L.P. v. James River Petroleum,* 130 F.3d 88, 93–94 (1997), the United States Court of Appeals for the Fourth Circuit held that trademark search reports were admissible evidence, stating that the "frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry under the first likelihood of confusion factor. This is especially true when the number of third-party registrations is great." (internal citations omitted).

**7.** Plaintiff CareFirst does submit a confusion survey that, in its view, indicates evidence of actual confusion. The Court disagrees that the survey reveals actual confusion. The survey is discussed *infra* in conjunction with the "actual confusion" factor.

First Care are mirror images of each other, a fact that Plaintiff CareFirst emphasizes.[8] But this fact does not take into account that CareFirst, when it communicates with the public, never uses the name "CareFirst" without accompanying it with "Blue Cross Blue Shield." *See* Def.'s Mot. for Summ. J. at Ex. 8, p. 117–18 (Gallant deposition). Suddenly, when one compares "CareFirst Blue Cross Blue Shield" with "First Care, P.C.," the mirror image that shone so brightly to Plaintiff CareFirst shines less so, especially when one is an insurer and the other is a doctors' office.

Furthermore, like most large corporations, Plaintiff CareFirst has a sophisticated logo. The logo includes text, "CareFirst Blue Cross Blue Shield," and two symbols, a blue cross and a blue shield. The text "CareFirst" consists of two words placed together without a space in-between and has a swooping arch incorporated within the fonts, extending from the "f" to the "t" in the word "first." Defendant First Care, on the other hand, does not have a special logo. Rather, the group uses the kind of locally made signs typically found in front of the average doctor's office. First Care's signs are adequate and professional, to be sure, but it is apparent to the Court that a team of graphic designers and marketing specialists were not involved in the signs' design. The lettering is plain, and no color or symbols are associated with the name. Because the parties' two marks present entirely different appearances, *see Petro Stopping*, 130 F.3d at 94, the Court **FINDS** that the marks are not confusingly similar.

█ With respect to the third and fourth factors, the Court must analyze the similarity of the goods and services that the marks identify and the facilities used by the parties.[9] In *Petro Stopping*, the United States Court of Appeals for the

---

**8.** Plaintiff CareFirst heavily relies on a 1987 decision by the Trademark Trial and Appeal Board ("TTAB") to support its contention that First Care is so similar to CareFirst as to create a likelihood of confusion. *See* Pl.'s Compl. at Ex. A. In the decision, Healthcare Corporation, CareFirst's predecessor, opposed the registration of the mark "First-Care," which was filed for the purposes of "providing advertising, promotional and management services to physicians and medical centers." Unlike the case here, however, FirstCare admitted that "its services of advertising, promotional and management services to physicians and medical centers [were] closely related to Healthcare's services of prepaid medical plans" as well as stated its belief that CareFirst was "confusingly similar" to FirstCare's mark. *Id.* at 2. Given that the parties conceded that the services were similar and that the marks were confusing, the TTAB decision is therefore distinguishable from the matter here.

**9.** According to Plaintiff CareFirst, the "facility" analysis does not apply to its collective membership mark. *See* Pl.'s Mot. for Summ. J. at 17. A collective membership mark is a mark that serves as an indicia of membership in an organization. 15 U.S.C. § 1054. Although collective membership marks are different from the typical trade and service marks identifying the source of goods and services, they are registered and enforced under the Lanham Act in generally the same manner and with the same effect as are trademarks. *See* 15 U.S.C. § 1127. According to McCarthy's treatise on Trademarks and Unfair Competition, "likelihood of confusion of collective membership marks with other types of marks is determined according to the standard rules of trademark law." 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:101 (4th ed.). While Plaintiff CareFirst cites *Electronic Design & Sales, Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 717 (Fed.Cir.1992) to support its contention that the facility analysis does not apply to collective membership marks, the Court is not persuaded that the decision stands for that proposition. Moreover, even if the facility analysis did not apply to collective membership marks, the Court still would conclude that no likelihood of confusion exists based on the other factors discussed.

Fourth Circuit concluded that two gas stations having "Petro" in their names did not offer similar services even though both stations sold fuel because, in the appellate court's view, the "services differed in virtually every respect." *See id.* at 95. The Court of Appeals for the Fourth Circuit went on to observe that one party was a gas station having typical travel center facilities while the other required its customers to use "card locks." *Id.* Here, the distinction between Plaintiff CareFirst and Defendant First Care is much more wide than in *Petro Stopping.* In this case, we have a large health insurance company on the one hand and a group of eleven doctors in two offices on the other. CareFirst provides health insurance to members all over the country; First Care, a group of doctors, provides traditional family medical care to people who live in the tidewater area. The two are very different. The Court therefore **FINDS** that there is no similarity between CareFirst and First Care with respect to their services, goods, and facilities.

With respect to the fifth factor, the Court also **FINDS** that no similarity of advertising exists in this case. Plaintiff CareFirst, during the period from 1996 through the first quarter of 2004, spent $54,500,000 on various forms of advertising. It advertises in nationwide newspapers and magazines and promotes itself on billboards on major highways and signs within mass transit facilities. It has a strict policy of always including the words "Blue Cross Blue Shield" with its Care-First mark when it communicates to the public. Defendant First Care, on the other hand, spends approximately $1,845 annually on advertising and promotional materials. The group uses signs in front of its offices, the local telephone directory, and new physician announcements in the local newspaper to promote itself. The

advertising campaigns conducted by the parties are vastly different.

With respect to the sixth factor, the Defendant's intent, the Court **FINDS** that Plaintiff CareFirst has pointed to no evidence indicating that First Care, P.C. adopted its name with the intent to trade on CareFirst's goodwill. In fact, Plaintiff CareFirst's own Vice President for Communications testified that the mark was not well known outside of Maryland in 1995, when First Care, P.C. began using the name First Care. *See* Def.'s Mot. for Summ. J. at Ex. 8, p. 144–45 (Gallant deposition). It is therefore unlikely that the group of doctors who chose First Care as the name of their practice did so because they knew about CareFirst. The Court is not convinced by Plaintiff Care-First's argument that Defendant First Care evidenced bad faith by continuing to use their name after Plaintiff CareFirst asked them to cease and desist. The idea that Defendant First Care is required to give up a name they have good reason to believe they are entitled to use in order to demonstrate that they have good faith is ridiculous.

The seventh and final factor, actual confusion, is "often paramount" to determining likelihood of confusion. "When the plaintiff's mark is strong and the defendant's use of a similar mark 'has actually confused the public, [the] inquiry ends almost as soon as it begins.' " *Lyons,* 243 at 804. As noted *supra,* Plaintiff CareFirst has offered no actual evidence that consumers have confused CareFirst with First Care. *See supra and compare Lyons,* 243 F.3d at 802; *with Lone Star,* 43 F.3d at 937; *and Sara Lee,* 81 F.3d at 466.

Plaintiff CareFirst has presented as evidence of confusion a "confusion survey" it had commissioned by its expert, Dr. Myron Helfgott. Telephone interviews were conducted with 130 CareFirst members to

determine how many of the members evidence confusion between the First Care and CareFirst marks. *See* Pl. Mot. for Summ. J. at Ex. Q. Dr. Helfgott concluded that 47 out of the 130 respondents (36%) were "likely to be confused in thinking that First Care and CareFirst and/or Blue Cross Blue Shield are related or affiliated companies." *Id.* The Court, however, **FINDS** that Dr. Helfgott's survey does not persuasively indicate any actual confusion between the two marks.

The primary problem with Dr. Helfgott's survey is that he includes as confused any respondent who believed that First Care, P.C. is affiliated with Blue Cross Blue Shield. Dr. Helfgott testified:

> I consider the client's entity that could be confused to be CareFirst Blue Cross Blue Shield and/or Blue Cross Blue Shield. Any part of that. If First Care is associated with any part of that would be a confusion response . . . .

*See* Pl.'s Mot. in Lim. at Ex. 2, p. 177–78. The problem with concluding that a confusion response exists when a respondent identifies First Care, P.C. with the words "Blue Cross Blue Shield" alone is that First Care, P.C. *is* affiliated with Blue Cross Blue Shield—it accepts Anthem Blue Cross Blue Shield insurance. For this reason, the idea that some survey respondents might associate First Care, a doctors' office, with Blue Cross Blue Shield is hardly earthshattering. The fact is that only two out of the forty-seven "confused" respondents actually identified CareFirst as being affiliated with First Care. This Court **FINDS** that two people out of 130 indicating actual confusion is *de minimus*. *See Petro Stopping*, 130 F.3d at 95. The Court is "not concerned with mere theoretical possibilities of confusion, deception, or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trade-

mark laws deal." *Electronic Design & Sales, Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 717 (Fed.Cir.1992). Moreover, this number is far below ten percent of the survey respondents, a threshold that the United States Court of Appeals for the Fourth Circuit established in order for survey evidence to indicate likely actual confusion. *See Sara Lee*, 81 F.3d at 467 n. 15.

After reviewing each of the factors required to show likelihood of confusion, the Court **GRANTS** Defendant First Care's motion for summary judgment. Plaintiff First Care is simply unable to make a showing sufficient to establish the likelihood of confusion, an element essential to its trademark infringement case.

## B. Dilution

■ The Dilution Act provides that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity . . ., to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). Under § 1125, in determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to:

(A) The degree of inherent or acquired distinctiveness of the mark;

(B) The duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) The duration and extent of advertising and publicity of the mark;

(D) The geographical extent of the trading area in which the mark is used;

(E) The channels of trade for the goods or services with which the mark is used;

(F) The degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) The nature and extent of use of the same or similar marks by third parties; and

(H) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

In this case, CareFirst has not demonstrated that its mark was famous when Defendant First Care began using the First Care name in 1995. In fact, there is substantial evidence in the record indicating that the mark was *not* famous when First Care began operating and was certainly not famous in Portsmouth and Chesapeake, Virginia. For example, Plaintiff CareFirst's Vice President of Communications testified that the CareFirst name was not well-known throughout the country in 1995—it was well known in Maryland. *See* Def.'s Mot. for Summ. J. at Ex. 8, p. 80–81 (Gallant deposition). When asked if the CareFirst name was well known in Virginia, Ms. Gallant testified that it was "less well known" than in Maryland. *Id.* In addition, Defendant First Care has introduced several of Plaintiff CareFirst's surveys and internal documents indicating that its CareFirst mark was a weak one as late as 1998. *See id.* 80–81. In 1999, Ms. Gallant discussed the weakness of the CareFirst mark in a presentation, where she stated:

> One of the things we've known for a while is the lack of identity between CareFirst and our HMOs. They carry the cross and shield, but there is a lack of identity clearly between us, not top-of-mind awareness.

*See id.* The record clearly reveals that the CareFirst mark was not a famous mark at the time First Care began operating under that name in 1995.

Moreover, as the Court's discussion of Plaintiff CareFirst's infringement claim indicates, Plaintiff CareFirst's dilution claim fails because medical insurance is a different service from medical care, the two parties' advertising is very different in duration and extent, and numerous third-parties use the mark. Plaintiff CareFirst also has not been able to prove that any actual dilution occurred. For these reasons, the Court **FINDS** that the CareFirst mark was not a famous and distinctive mark in 1995 and thus cannot prove an element essential to its dilution claim.

## III. Conclusion

In order to prevail in this matter, Plaintiff CareFirst either would have to show that a likelihood of confusion existed between First Care and CareFirst or that its mark was famous and distinctive before 1995. Ultimately, Plaintiff CareFirst has failed in its burden because both parties provide entirely distinctive services in this community. In fact, its failure is so spectacular that the Court has strained to understand why it has persisted with this case at all and wonders what is driving the volume of motions and the lack of cooperation between the attorneys. Here, given the amount of paper and motions that has been generated to date, Plaintiff CareFirst must have very deep pockets indeed, and Defendant First Care evidently has deeper pockets than one would anticipate given the volume of paper and motions generated on its part as well.

For the above reasons, the Court **RE-VERSES** the order of October 15, 2004 allowing the defendant to file a very late counterclaim, **GRANTS** Defendant First Care's motion for summary judgement, **DENIES** Plaintiff CareFirst's motion for

summary judgment, and **DISMISSES** the case.

The Clerk is **DIRECTED** to fax and send a copy of this Order to all counsel of record and to mail a copy to all counsel.

**IT IS SO ORDERED.**