**YELLOWBRIX, INC., Plaintiff,**

v.

**YELLOWBRICK SOLUTIONS, INC., Defendant.**

**No. 5:00–CV–764–BO(3).**

United States District Court, E.D. North Carolina, Western Division.

July 10, 2001.

**576**

William C. Smith, Jr., Manning, Fulton and Skinner, Raleigh, NC, for plaintiff.

Hayden J. Silver, III, Alan D. McInnes, Kilpatrick Stockton, Raleigh, NC, for defendant.

## ORDER

TERRENCE WILLIAM BOYLE, Chief Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction. In the underlying suit, Plaintiff alleges the following: (1) trademark infringement and false designation of origin under the Lanham Act; (2) cyberpiracy under the Lanham Act; (3) unfair and deceptive trade practices under the North Carolina Unfair Trade Practices Act; and (4) unfair competition under North Carolina law.

## FACTS

Plaintiff Yellowbrix, Inc. ("Yellowbrix") is a web-based technology company that is incorporated in Delaware and has its headquarters in Virginia. Yellowbrix provides "custom marketing" services to consumer web sites, commercial web sites, and corporate intranets and extranets. Yellowbrix uses artificial intelligence technology to tailor its customers' websites to suit the particular tastes and needs of their users. This technology enables Yellowbrix customers to target specific advertisements or announcements to web users who have an interest in those particular products or services.

Defendant YellowBrick Solutions, Inc. ("YellowBrick") is a software company that

is incorporated in Delaware and has its principal place of business in North Carolina. YellowBrick sells software that integrates information that has been compiled on numerous information-gathering systems. YellowBrick software puts information from various sources into a single format and allows its customers to view such information in "real time". YellowBrick's software is primarily suited to large companies that communicate with their customers through numerous channels, i.e., via telephone call centers, direct mail, e-mail, the Internet, retail locations, etc. Such companies use Yellowbrick's software to integrate all of the information derived from the various customer-facing applications to give the company a complete and instantaneous view of each of its customers. Although YellowBrick provides some consulting services, such services are offered only in connection with the sale of their software products.

On October 15, 1999, NewsReal, Inc. ("NewsReal"), the predecessor in interest to Yellowbrix, acquired the domain name, "www.yellowbrix.com". On March 1, 2000, NewsReal filed an application with the United States Patent and Trademark Office ("USPTO") to register the word mark, "Yellowbrix". In its application, NewsReal stated that Yellowbrix provided, inter alia, the following products and services: (1) computer hardware and software (undefined); (2) marketing services; (3) internet services; (4) content analysis and accessed data content with "target content"; (5) contextually relevant content, data, commerce and advertising; and (6) enabling technology. On March 1, 2000, Yellowbrix also filed an application in the USPTO to register "Yellowbrix and design".

On December 27, 1999, Market Insights, YellowBrick's predecessor in interest, secured the domain name, "www.yellow-bricksolutions.com". Although it was aware that the "www.yellowbrix.com" domain name had been taken by that time, YellowBrick did not know about Plaintiff or the nature of its services when it secured the domain name "www.yellobricksolutions.com".

On April 24, 2000, Defendant filed an application in the USPTO to register the mark "YellowBrick Solutions". Defendant chose the name because of the wide recognition of the "yellow brick road" image. Specifically, Defendant wanted to associates its integration software with the image of the yellow brick road and the idea of the "path to success" that is generally attached to such image. Prior to choosing the name "YellowBrick Solutions", Defendant commissioned a search report of trademarks and domain names using the words "yellow" and "brick" or any similar variation. The trademark report was completed on February 8, 2000, prior to Plaintiff's filing its application in the USPTO, and the report did not identify Plaintiff's pending trademark application. Defendant was unaware of any commercial presence by Plaintiff in February of 2000, the time at which its board of directors authorized it to adopt "YellowBrick Solutions" as a trademark for its products and services.

On October 13, 2000, Plaintiff filed the instant Motion for Preliminary Injunction. On November 17, 2000, Defendant filed an opposing memorandum. This Court held a hearing in the matter on November 28, 2000 and the issue is ripe for adjudication.

### ANALYSIS

"[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th

Cir.1994) (quoting *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981)). Preserving the status quo pending adjudication on the merits is its purported aim. See *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195 (4th Cir.1977). The Fourth Circuit standard for awarding interim injunctive relief is the "balance-of-hardships" test. *Id.* at 196; *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir.1991).

Under this test, the Court determines whether the harm likely to be suffered by plaintiff if relief is denied is actual and imminent or merely remote and speculative. *Direx Israel, Ltd.,* 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2nd Cir. 1989)). After deciding whether the plaintiff will suffer irreparable harm if the motion is denied and determining the nature of the harm, if any, that defendant will suffer if the motion is granted, the district court must balance these hardships against one another. *See id.* at 812–13.

On the basis of this balancing, the Court "determine[s] the degree by which a 'likelihood of success' on the merits must be established before relief may issue." *See id.* at 811. "The more the balance of harms leans away from the plaintiff, the stronger his showing on the merits must be." *Steakhouse, Inc. v. City of Raleigh, N.C.,* 166 F.3d 634 (4th Cir.1999). Finally, the Court must consider the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977).

### 1. *False Designation of Origin under Section 43(a) of the Lanham Act*

First, YellowBrix claims that it is entitled to injunctive relief on its claim for false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). To succeed on such a claim, Plaintiff must establish that there is a likelihood of consumer confusion as to the source, origin, or sponsorship of the products or services involved. *See Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987). Plaintiff need not show actual confusion in the marketplace, but must demonstrate a likelihood of consumer confusion. *See Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984).

Courts generally consider seven factors to determine the likelihood of confusion, including: (1) the distinctiveness of the senior mark; (2) the similarity of the marks; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities employed by the parties to transact their business; (5) the similarity of the advertising used by the parties; (6) the defendant's intent in adopting the same or similar mark; and (7) evidence of actual confusion. *Resorts of Pinehurst v. Pinehurst Nat'l Corp.,* 148 F.3d 417, 422–23 (4th Cir.1998). However, "[n]ot all these [factors] are always relevant or equally emphasized in each case." *See Pizzeria Uno,* 747 F.2d at 1527. In this case, only the second and fourth factors in the analysis militate toward a finding that there is a likelihood of confusion.

In considering factor two, the similarity of the parties' marks, courts generally focus on the dominant portions of parties' marks. *See Lone Star Steakhouse,* 43 F.3d at 936. "[A]n overall test under this factor is whether there exists a 'similarity in appearance' and sound which would result in confusion." *Petro Stopping Centers, L.P.,* 130 F.3d at 94. In this case, the similarity of "Yellowbrix" and "Yellow-Brick Solutions" is readily apparent. The two marks sound similar, given that they both share the term "Yellowbricks" (or its phoenetic equivalent) in common. The only difference between the marks is the way that they are spelled and the addition

of the word "Solutions" to Defendant's mark. The similarity of the two marks thus weighs in Plaintiff's favor.

Also weighing in Plaintiff's favor is the fact that both Plaintiff and Defendant market their services, at least in part, on the Internet, so that they transact business using the "same facility." Both have websites that describe their services and products and are used as a marketing tool to attract customers. Nonetheless, because the Internet has become such a prevalent channel of trade, the probativeness of this factor is somewhat diminished in determining whether there is a "likelihood of confusion" amongst consumers of the parties' products.

█ Moreover, both of the factors that favor Plaintiff are outweighed by the balance of the other factors to be considered by this Court under the likelihood of confusion analysis. As an initial matter, the "strength of Plaintiff's mark" factor weighs against Plaintiff, because Plaintiff's mark is neither distinctive nor strong. Marks may be classified along a spectrum of increasing distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Despite its contentions to the contrary, Plaintiff's mark is neither "fanciful" nor "arbitrary". "Yellowbrix" is not a fanciful term because it is not a made-up term coined by Plaintiff. It is a clear play on the term "yellow bricks." Neither is "Yellowbrix" an "arbitrary" mark, because it was not arbitrarily assigned by Plaintiff. Plaintiff claims that it came up with the name "because we liked it." Hearing Transcript at 5. However, Plaintiff can't escape the fact that by the time it adopted the mark, "yellow bricks"

or, more specifically, the "yellow brick road", had long been part of American culture.[1] Plaintiff's in-hearing contention that the name "isn't supposed to be [a] Wizard of Oz" allusion is thus tenuous. *See id.* The term "yellow bricks" invokes an Oz-inspired image of success and progress. Plaintiff's mark therefore associates Plaintiff's products and services with a positive symbol and is not "arbitrary" in doing so.

█ Plaintiff's mark may be arguably distinctive in that it is a "suggestive" mark. A "suggestive" mark is one that "requires some operation of the imagination to connect" its meaning with the mark. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984). Nonetheless, "[e]ven a mark held to be suggestive may be found weak under the first likelihood of confusion factor." *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997). The strength of a mark " 'ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.' " *Id.* (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997)).

In this case, Plaintiff has provided no evidence that "Yellowbrix" has garnered a strong association in the internet marketing business or a "secondary meaning" over and above its association with the "yellow brick road" of *The Wizard of Oz*. This is bolstered by evidence that over 42 applications were filed with the USPTO for trademarks containing "yellow brick" or its phonetic equivalent. *See Petro Stopping Centers*, 130 F.3d at 93 ("The frequency with which a term is used in other trademark registrations is indeed relevant to

---

**1.** The "yellow brick road" has become a household term by virtue of the popularity of the 1939 movie *The Wizard of Oz*, adapted from L. Frank Baum's venerated children's book *The Wonderful Wizard of Oz*, which was published in 1900.

the distinctiveness inquiry under the first likelihood of confusion factor. This is especially true when the number of third-party registrations is great."). Moreover, because Plaintiff secured the "www.yellow-brix.com" domain name only three months prior to Defendant and filed its trademark application only two months prior to Defendant, there was little time for the mark to gain brand recognition in the relevant market. Because Plaintiff's mark is a relatively weak suggestive mark, therefore, the "distinctiveness" factor weighs against Plaintiff.

Factor three, which concerns the similarity of the goods or services that the marks identify, also weighs against a finding of likelihood of confusion. Plaintiff uses artificial intelligence technology to tailor its customers' web sites to suit a viewer's specific needs or tastes and, thus, to provide its customers with "custom marketing" capabilities. Plaintiff's customers include corporate intranets and consumer and commercial websites. Defendant, by contrast, does not aid its customers in honing their web-based marketing techniques. Instead, Defendant sells software that allows its customers to integrate information. Simply put, Plaintiff is about sifting and channeling information in order to present it to the market in a targeted manner, while Defendant is about integrating multiple information sets, to create a single, comprehensive set of information to be used by its clients for various purposes.

The distinctiveness of the parties' products is evidenced by the differences in the consumers of their products. The number of companies that would benefit from Defendant's product is a minor subset of those that could use Plaintiff's services. While any company, organization or individual with a website might use Plaintiff's marketing tools, only large corporations in need of a stream-lined information system may be in the market for Defendant's software. As a result of their different products and different consumer markets, Plaintiff and Defendant have never exhibited at any of the same trade shows. The "likelihood of confusion" is thus mitigated by the fact that Plaintiff and Defendant offer distinct products to very different markets.

The distinct advertising methods used by the two parties also weigh in favor of Defendant. Although both parties use websites to advertise their products, their advertising is not "similar" under the likelihood of confusion analysis. Visually, the websites appear entirely distinct, with different typeface, bannerheads, and varied layouts. Indeed, the only similarity between the websites of the two parties is that they both mention the word "solutions", which itself is a prevalent term used in the technology sector.[2] Plaintiff's website describes its services and the method by which it allows customers to target information to specific consumers. Defendant's website, on the other hand, describes its software, which achieves the specific purpose of information integration. This, along with the parties' different uses of graphics, selling points, and conceptual framework, make the advertising done by the two parties distinct and unlikely to lead to confusion.

The sixth factor, an important one in this case, involves the defendant's intent in adopting the same or similar mark. Defendant's knowledge of Plaintiff's mark at the time of the alleged infringement is a prerequisite to a finding of intent. In such a case, intentional infringement may

---

2. *See* Ferruzza Aff. ¶ 15 ("Many software companies use the word 'solution' or 'solutions' to describe their products and services. That is what software does by definition: it provides an automated solution for information in business.").

be established by showing that Defendant was a "second comer" to the market and that it breached its duty to "name ... its product as to avoid all likelihood of consumers confusing it with the product of the first comer." *See Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir.1990). In this case, Defendant was "totally unaware of any commercial presence by the Plaintiff" at the time that it voted to adopt the "YellowBrick Solutions" trademark. *See* Ferruzza Aff. ¶ 14. This fact is not surprising given that the parties did not compete in the same market and that they began to use their respective marks within months of each other. Accordingly, at the time that Defendant commissioned a research report on other trademarks or domain names in February of 2000, the report did not identify Plaintiff's mark.

Also bolstering a finding of lack of intent is the fact that Plaintiff presents no evidence that Defendant attempted to capitalize on brand name recognition of its "Yellowbrix" mark. Instead, the record supports Defendant's contention that, in conjunction with a marketing consultant, it selected "YellowBrick Solutions" "because of the inherent brand image of the yellow brick road" and the way in which the "yellow brick road" could be used as a visual representation of Defendant's information integration software. *Id.* ¶ 15. The fact that Defendant did not intend to infringe Plaintiff's mark or to benefit from its brand recognition weighs against Plaintiff's claim of likelihood of confusion.

Lastly, there has been no evidence of actual confusion to support Plaintiff's claim. Plaintiff and Defendant's websites have been functioning and co-existing since July 31, 2000, and yet Plaintiff has provided no evidence of a single instance of confusion on the part of its consumers.[3] Plaintiff is correct that a lack of such evidence, taken alone, does not require a finding of an unlikelihood of confusion. However, the fact that consumers have, thus far, avoided confusion over the parties' marks supports a finding that they are unlikely to become confused in the future. It also lends credence to Defendant's argument that its products are so dissimilar and its market so distinct from Plaintiff's that consumers will not confuse the two parties' marks.

The unlikelihood of consumer confusion between the parties' marks mitigates the harm that Plaintiff would suffer were its preliminary injunction motion to be denied. Defendant, by contrast, would suffer significant financial harm, were it required to cease doing business under the "YellowBrick Solutions" mark, the promotion of

---

3. Plaintiff cites one instance in which a potential customer inputted Plaintiff's name incorrectly into a web browser and, as a result, was directed by the web browser to Defendant's website. However, after reviewing the website, it was obvious to the customer that the website that he was viewing was not Plaintiff's website. It was clear to the customer that the website that he was viewing (that of Defendant) offered different services than Yellowbrix. Recognizing his mistake, he inputted Plaintiff's name again, this time correctly, and was directed to Plaintiff's website. *See* Russell Aff. ¶¶ 7–10. Rather than indicating a likelihood of consumer confusion, this anecdote reenforces this Court's finding that Plaintiff's and Defendant's products are distinct and not easily confused by potential customers. It is also consistent with the notion that consumers of Plaintiff's and Defendant's products and services are knowledgeable about technology and the differences therein. As relatively sophisticated consumers, they may not be easily "confused". Consumer sophistication is yet another factor that may be considered in likelihood of confusion analysis. *See See Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463–64 (4th Cir.1996). The sophistication of the generally technologically-savvy consumers at issue in this case supports this Court's finding that consumer confusion is relatively unlikely.

which has required significant investments of time and money.[4] Moreover, the fact that consumers are unlikely to confuse Defendant's mark with that of Plaintiff makes it unlikely that Plaintiff will succeed on the merits of its trademark infringement claim. For these reasons, and in light of the fact that the public interest does not weigh in favor of issuing the injunction, Plaintiff's Motion will be denied based on its claim for false designation of origin under the Lanham Act.

### 2. Cybersquatting under Section 43(d) of the Lanham Act

The Anticybersquatting Consumer Protection Act ("ACPA") imposes liability on a defendant who: (i) has a bad faith intent to profit from that mark . . .; and (ii) registers, traffics in, or uses a domain name that—(I) in the case of a mark that is distinctive . . ., is identical or confusingly similar to that mark; (II) in the case of a famous mark . . ., is identical or confusingly similar to or dilutive of that mark. *See* 15 U.S.C. § 1125(d)(1)(A). The ACPA provides a number of factors that may be considered in the "bad faith" determination, including, *inter alia:* (1) the defendant's trademark or other rights in the domain name; (2) the extent to which the domain name consists of the legal name of the person; (3) the person's prior use of the domain name in connection with the bona fide offering of goods or services; (4) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (5) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others; and (6) the extent to which the mark incorporated in the person's domain name registration

is or is not distinctive and famous. *See* 15 U.S.C. § 1125(d)(1)(B)(i). The Statute also includes a safe harbor provision that states that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." *See* 15 U.S.C. § 1125(d)(1)(B)(ii).

In this case, Plaintiff used its legal name, YellowBrick Solutions, to form its domain name, "www.yellowbricksolutions.com". By the time its web site was launched, Defendant already had a trademark application pending for the "Yellow-Brick Solutions" mark and was doing business under that name. There is no evidence that Defendant provided false or misleading contact information in applying for its domain name. Nor did Defendant apply for any other domain name that was confusingly similar to Plaintiff's "www.yellowbrix.com" domain name.

Finally, Defendant's product is distinct from that of Plaintiff and, as discussed, is marketed to a different set of consumers. Because Defendant is not a competitor of Plaintiff, it did not seek to "syphon off" Plaintiff's customers by adopting the "www.yellowbricksolutions.com" domain name. In fact, Defendant states that it was unaware of Plaintiff's market presence at the time it adopted the YellowBrick Solutions mark and planned to launch its web site under that name. For these reasons, Defendant had reasonable grounds to believe that the use of the domain name was fair and otherwise lawful. Having failed to prove Defendant exhibited bad faith in its use of the "www.yellowbricksolutions.com" domain name, Plaintiff has failed to demonstrate an essential element of its cybersquatting claim. Because

---

**4.** As of November 17, 2000, YellowBrick Solutions had spent over $800,000 in developing and marketing the mark "YellowBrick Solutions". *See* Ferruzza Aff. ¶ 16.

Plaintiff is unlikely to succeed on its cybersquatting claim, this Court finds that it is not entitled to a preliminary injunction based thereupon.

### 3. North Carolina Unfair Trade Practices Act

North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") provides a cause of action to competitors for "[u]nfair methods of competition in or affecting commerce." N.C.Gen.Stat. § 75–1.1(a). "What is an unfair or deceptive trade practice depends upon the facts of each case and the impact the practice has in the marketplace." *See Johnson v. Phoenix Mut. Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610, 621 (1980), *overruled on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385, 391–92 (1988). Generally speaking, a practice is "deceptive if it has the tendency to deceive . . . '[and is] unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' " *See Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676, 681 (2000) (quoting *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)).

In considering Plaintiff's trademark infringement claim, this Court concluded that Defendant did not infringe Plaintiff's trademark rights, because there was no likelihood of consumer confusion between Plaintiff's and Defendant's marks. This conclusion was based on a number of factors, including the distinctiveness of the products and services offered by Plaintiff and Defendant, the differences in their consumer markets, the distinctiveness of their advertising, as well as the relative weakness of Plaintiff's mark. For these reasons, the Court found that Defendant did not "syphon off" Plaintiff's customers by using the YellowBrick Solutions mark, nor did it intend to do so. Because De⸍ndant did not act deceptively or unfairly in adopting its domain name or its mark, Plaintiff is unlikely to succeed on its claim under the UDTPA. Plaintiff's Motion for Preliminary Injunction based on the UDTPA must therefore be denied.

### 4. Unfair Trade Practices under North Carolina Law

The North Carolina common law of unfair competition in the context of trademarks and tradenames is similar to the federal law of trademark infringement. In order for a defendant to be held liable thereunder, a plaintiff must demonstrate that the defendant engaged in "unfair competition". Although not strictly defined, unfair competition is generally referred to as that "which a court of equity would consider unfair". *See Harrington Mfg. Co., Inc. v. Powell Mfg. Co., Inc.*, 38 N.C.App. 393, 248 S.E.2d 739, 744 (1978). Moreover, "the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *Id.*

For all of the reasons that Defendant may not be held liable under the UDTPA, Defendant's conduct was not "unfair" and should not be held to violate North Carolina law. Accordingly, Plaintiff is unlikely to succeed on its common law unfair practices claim and is not entitled to a Motion for Preliminary Injunction based on that claim.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is hereby DENIED. In addition, Plaintiff's Motion for Protective Order and Defendant's Motions for Limited Expedited Discovery

584

and for Extension of Time to Respond to Plaintiff's Preliminary Injunction Motion are hereby DISMISSED as MOOT.

SO ORDERED.