### UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, Plaintiff,

v.

### MEDIA RESEARCH CENTER, Defendant.

### No. CIV.A.1:05 693.

United States District Court, E.D. Virginia, Alexandria Division.

May 12, 2006.

---

**618**

G. Franklin Rothwell, Steven Lieberman, Anne M. Sterba, Rothwell, Figg, Ernst & Manbeck, P.C. (Washington, D.C.), Richard C. Sullivan, Jr., Reed Smith LLP (Falls Church, Virginia), Counsel for Plaintiff United States Conference of Catholic Bishops.

Steven J. Wadyka, Jr., Janet Shih Hajek, Kevin B. Bedell, Greenberg Traurig, LLP (McLean, Virginia), Counsel for Defendant Media Research Center.

## MEMORANDUM ORDER

LEE, District Judge.

THIS MATTER is before the Court on Defendant Media Research Center's (hereinafter "MRC") Motion for Summary Judgment. This case concerns the claim of the United States Conference of Catholic Bishops (hereinafter "USCCB") that MRC infringed on Plaintiff's trademark by utilizing a mark confusingly similar to the mark that Plaintiff uses to identify Plaintiff's news service. The issue before the Court is whether to grant Defendant's Motion for Summary Judgment where Plaintiff's supposed trademark is merely descriptive and therefore not eligible for protection under the Lanham Act without having acquired secondary meaning, and where Plaintiff has not shown a likelihood of confusion between the two marks. Plaintiff is an organization comprised of all of the active Catholic bishops in the United States. For over eighty years, Plaintiff has run a news service under the name Catholic News Service which reports on matters of interest to the Catholic church. On March 2, 2001, Plaintiff filed for a registration for the mark "Catholic News Service" as a descriptive mark, and Plaintiff's registration was issued on October 8, 2002. Plaintiff occasionally uses "CNS" as an abbreviation for "Catholic News Service" in its news stories or publications.

Defendant MRC is a non-profit corporation which launched its own general news wire reporting on matters of general interest in 1998. Defendant originally used the name "Conservative News Service," and came up with the name "CNSNews.com" to brand its product to reflect its website URL. After the United States Patent and Trade Office (hereinafter "USPTO") denied MRC's application for a trademark on "Conservative News Service," MRC created the name "Cybercast News Service" so that it could maintain the website URL that it owned at the time. In February 2000, a client of Catholic News Service informed Catholic News Service that another entity was using the initials "CNS," and since that time, Plaintiff has been aware of Defendant's use of these initials. MRC sought, and was granted, a federal registration for its trademark, "CNSNews.com–Cybercast News Service (with design)." MRC's news service operates exclusively through the internet at the web address "www.cnsnews.com," and its stated goal is to provide accurate, balanced, and timely news, appealing to a broad base of leadership across the political spectrum. MRC brands its news service as "CNSNews.com" and uses at least that identifier to identify its products and services. Plaintiff filed this suit in 2005 claiming that Defendant's use of "CNS" could confuse customers and cause a loss of business for Plaintiff. The Court now grants Defendant's Motion for Summary Judgment because Plaintiff's trademark is merely descriptive and thus not protected under the Lanham Act without evidence of secondary meaning, and Plaintiff cannot show a likelihood of confusion between Plaintiff's and Defendant's marks.

## I. BACKGROUND

This case concerns the claim of the USCCB that Defendant MRC infringed

upon Plaintiff's trademark by using a confusingly similar mark when Defendant abbreviated its name to "CNS," "CNS News," and "CNSNews.com."

*Plaintiff's Organization*

Plaintiff USCCB is comprised of all of the active Catholic bishops in the United States, and Plaintiff conducts much of its activity through committees. For over eighty years, the USCCB has run a news service on issues of interest to the Catholic church. In 1989, Plaintiff changed the name of its news service from "National Catholic News Service" to "Catholic News Service." Plaintiff occasionally used the abbreviation "CNS." Catholic News Service primarily provides news stories to clients and sells publishing rights in USCCB content. Plaintiff sells its content to other publications, primarily Catholic diocesan newspapers, and maintains a web site at www.catholicnews.com. Nearly all of Catholic News Service's clients are United States Catholic diocesan newspapers, Catholic broadcasters, and Catholic foreign news organizations, although Plaintiff has had secular news institutions such as ABC News, CBS News, Newsweek, The New York Times, Reuters, Time Magazine, U.S. News and World Report, and The Washington Post as clients. The largest part of the Catholic News Service's funding, however, comes from diocesan publications. Plaintiff does only minimal advertising, confined to Catholic trade publications, for its news service, although USCCB has attended several secular conventions for journalists. Plaintiff's news organization identifies itself both as "Catholic News Service" and as "CNS."

While Plaintiff's style book indicates that Catholic News Service writers should use "CNS" only as a second reference after "Catholic News Service," the style book also indicates that datelines should appear as: "WASHINGTON (CNS)."

Plaintiff, however, lists itself in directories as "Catholic News Service," not as "CNS," and its web page bears the title "Catholic News Service" in large bold letters across the top, with secondary references to "CNS" in smaller type throughout the web page. Primarily, Plaintiff receives press passes issued to reporters working for "Catholic News Service," although Plaintiff claims there have been six press passes identifying the news service only as "CNS." Plaintiff's publications contain both a byline and a dateline. Plaintiff's policy is to use "CNS" in the dateline and "Catholic News Service" in the byline.

On March 2, 2001, Plaintiff obtained Registration Number 2,630,640 for the mark "Catholic News Service ('news service' disclaimed)" as a descriptive mark for "printed materials, namely newsletters, periodicals and brochures, containing information about current affairs, including news, features, and photographs, from a Catholic perspective" and "distribution of news, features, and photographs of current events from a Catholic perspective, via a global computer information network, postal service and print publications." This registration was issued on October 8, 2002. Plaintiff has not done any research, nor performed any surveys or studies indicating the degree to which consumers recognize "CNS" as identifying Plaintiff's organization.

*Third Party Uses of "CNS"*

Defendant points to thirty-five third-party uses of "CNS," at least four of which are news services. Catholic News Service has not objected to the vast majority of these uses. The news organizations using "CNS" publish stories on religion and on the topics cited by Plaintiff as examples of topics covered both by Catholic News Service and CNSNews.com–Cybercast News Service. Such topics include the Earth Summit, stem-cell research, and the pre-

scription drug RU–486. For example, the Capital News Service of the University of Maryland's College of Journalism uses "CNS" prominently on its web site, albeit not in its bylines or datelines. Capital News Service has published stories about human cloning, stem-cell research, and even actions taken by Plaintiff USCCB.

Additionally, City News Service in California, Copley News Service, Capital News Service, and CNS News 22 all use "CNS" in connection with their distribution of news. These entities have published articles on topics also covered by Catholic News Service. Such topics include litigation regarding child molestation claims against Catholic priests; the Terri Schiavo affair; same-sex marriage; RU–486, the so-called "morning after pill;" and the human response to natural disasters. Plaintiff has never objected to these entities using "CNS."

The Cardinal Newman Society is an organization dedicated to renewing and strengthening Catholic identity at Catholic colleges and universities. Although not primarily a news service, Cardinal Newman Society has abbreviated its name to "CNS" in the past and has issued news alerts and press releases on topics covered by Catholic News Service. This includes reports on the Terri Schiavo affair.

Charisma News Service is an internet news wire service specializing in Christian religious topics. Charisma News Service has abbreviated its name to "CNS" in the past. Plaintiff requested that Charisma News Service stop using "CNS" and, although Plaintiff claims that Charisma News Service stopped using "CNS" upon Plaintiff's request, Plaintiff has made no effort to determine whether Charisma News Service subsequently used "CNS." Altogether, there have been thirty-two applications for federal trademarks that include "CNS," most of which have matured into registrations.

*Defendant's Organization*

In 1998, Defendant launched its own general news wire reporting on matters of general interest. MRC initially called its service "Conservative News Service." MRC came up with the name "CNSNews.com" primarily as a function of branding its product to reflect its website URL. After the USPTO denied MRC's application for a trademark on "Conservative News Service," MRC came up with "Cybercast News Service" so that it could maintain the URL that it owned at the time. The name was selected from staff submissions of possible new names, and MRC began using that name in June 2000.

Plaintiff was aware of MRC's use of "CNSNews.com" as of February 2000 when Chris Gunty, a client of Catholic News Service, informed Catholic News Service that there was another entity using the initials "CNS." Plaintiff did not oppose MRC's application for trademark registration. Plaintiff did, however, issue cease and desist letters, engaged in efforts to negotiate, and finally commenced this litigation.

MRC sought and was granted a federal registration for its trademark, "CNSNews.com–Cybercast News Service (with design)," Registration No. 2,528,246. MRC's news service operates through the internet, at the web address "www.cnsnews.com." Defendant also enters into agreements with clients to republish its stories. MRC has never had clients that were members of the Catholic press or Catholic diocesan publications, although Defendant has sought to get Matt Daniels, Director of the Alliance for Marriage, as a subscriber to the CNSNews.com news service.

CNSNews.com promotes itself through referrals from other websites that either

have a link to CNSNews.com's homepage or by displaying a headline with a link to CNSNews.com's homepage. CNSNews.com seeks to get links and referrals from websites that publish "hard news" on a variety of national and international topics, excluding entertainment and sports. CNSNews.com is part of the secular press which does not report on issues from a religious perspective.

CNSNews.com engages in limited paid advertising, instead getting recognition through "earned media," namely mentions on nationally syndicated radio or television programs. MRC sought to promote CNSNews.com on radio stations, particularly those with news and information programming in large media markets. CNSNews.com also sought to promote CNSNews.com on mainstream television networks such as ABC, CBS, and NBC, as well as in newspapers. CNSNews.com has never advertised in any of the limited trade publications in which Plaintiff has advertised its Catholic News Service.

MRC predominantly brands its news service as "CNSNews.com" and uses at least that identifier, if not the whole name "CNSNews.com–Cybercast News Service" or its actual registered trademark "CNSNews.com–Cybercast News Service (with Design)" to identify its product and services. Defendant, however, does use the mark "CNS" in its metatags and used "CNS" on its website. CNSNews.com tries to ensure that third parties accurately identify it by its correct name, "CNSNews.com" or "Cybercast News Service." It also requires newspapers that print its stories to attribute the stories to "CNSNews.com." Its reporters identify that they have an affiliation with "CNSNews.com."

*Website Usage and Instances of Confusion*

CNSNews.com has produced an average of twelve stories per day, five days per week, for an approximate total of 17,000 stories since it began using its "CNSNews.com–Cybercast News Service (with Design)" trademark in June 2000. Since this time, CNSNews.com has received a total of 82,352,804 visitor sessions on its website. Approximately 13,800 of these visitor sessions resulted from a user typing "CNS" into a search engine. Approximately 225,000 to 275,000 people read CNSNews.com through the websites of its Cybercast Streaming clients.

During this same period, Catholic News Service has produced approximately twenty-five (25) stories per day, five days per week. Its website receives approximately 4,000 to 5,000 page views per day. Catholic News Service's subscriber clients' total circulation reached 5,812,482 in 2001.

Plaintiff claims that it has identified seven instances of actual confusion since MRC began using its "CNSNews.com–Cybercast News Service (with Design)" trademark. The first alleged instance of confusion concerns an e-mail forwarded on May 17, 2002, originally sent by Matt Daniels, the Executive Director of the Alliance for Marriage, an organization that lobbies in favor of a Constitutional amendment defining marriage as being between a man and a woman. This was the subject matter of the article in question. The second alleged instance of confusion concerns a July 17, 2002 e-mail from Peter Droege. Mr. Droege complained to the Catholic News Service that "I have followed the discussion about cloning humans and was appalled by the article below from CNS." The article that Mr. Droege cited came from MRC's CNSNews.com. Plaintiff's third instance comes from a printout of a third party website with a story written by CNSNews.com, but with a byline of "Catholic News Service." Plaintiff's fourth alleged instance of confusion took place on the same third party website wherein a

CNSNews.com article had CNSNews.com in the dateline, CNSNews.com in the acknowledgment section, but the quotation "Bruce Sullivan is a Staff Reporter with Catholic News Service" in the author section. Plaintiff's fifth instance of confusion comes from an e-mail to Mark Lombard from the International Desk of the news service advising that it had received a call "from someone concerned about correspondence they had received from a Scott Hogenson. The person assumed it was us, but I told him that CNSNews.com was not us, and that there was an ongoing legal battle about the name." Plaintiff's sixth incident of confusion is reflected in an e-mail exchange between Julie Asher, National Editor of the Catholic News Service and Mark Lombard. In the e-mail, Ms. Asher reported that CNS had received "two calls from people looking for a story we did, but they really wanted CNSNews.com." Plaintiff's seventh and final alleged instance of confusion resulted from several postings on a blog. One poster on the blog identified an article from CNSNews.com. Another poster on the blog responded in relevant part by writing, "[w]ho is CNS.com? It's the Catholic News Service."

Plaintiff has not conducted any survey designed to measure confusion between Plaintiff's Catholic News Service and Defendant's CNSNews.com–Cybercast News Service. Catholic News Service is not aware of losing any customers, clients, press credentials, or advertising space as a result of confusion with CNSNews.com. Catholic News Service maintains, however, that the possibility that it lost such opportunities still exists.

## II. DISCUSSION

### A. Standard of Review

Under Rule 56(c), the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To prevail on either of its claims, Plaintiff must demonstrate that "it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir.1995). To prove a likelihood of confusion, Plaintiff must show more than a mere possibility of confusion or mere resemblance of the marks. *See, e.g., AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir.1976); *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir.1970). Instead, the trademark owner must show a probability of confusion. *Lacoste Alligator, S.A. v. Bluestein's Men's Wear, Inc.*, 569 F.Supp. 491, .497 (D.S.C.1983). The trademark owner must make this showing with respect to an appreciable number of typical consumers who exercise due care in the marketplace. *Quality Inns, Int'l Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 209 (D.Md.1988).

## B. Analysis

### 1. Plaintiff's "CNS" Mark Does Not Qualify for Protection Under the Lanham Act Because it is Merely Descriptive and Has Not Acquired Secondary Meaning

■ The Court grants Defendant's Motion for Summary Judgment because Plaintiff's "CNS" mark is merely descriptive and does not qualify for protection under the Lanham Act because it has not acquired secondary meaning. Courts in this Circuit analyze the descriptiveness of a trademark on a scale with four categories ranging from least distinctive to most distinctive. *See Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004). The categories are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary and fanciful. *See, e.g., id.; see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Initials for a descriptive phrase merely represent short forms of the words for which they stand and should receive the same degree of protection as those words. *See G. Heileman Brewing Co. v. Anheuser–Busch Inc.*, .676 F.Supp. 1436, 1493 (E.D.Wis.1987) (claiming that, "as a practical matter, initials do not differ significantly in their trademark role from the descriptive words they represent").

Here, Plaintiff uses the initials "CNS" as shorthand for its full name, Catholic News Service. The USPTO expressly determined that "Catholic News Service merely describes the subject matter of the applicant's publication" and was therefore not entitled to registration. (Statement of Undisputed Material Facts (hereinafter "SOF") ¶ 13.) As the initials for a phrase which the USPTO has determined is merely descriptive, Plaintiff's claimed "CNS" mark is itself a descriptive mark under the *Heileman* standard. Such a mark cannot qualify for protection absent secondary meaning.

■ Descriptive marks do not qualify for protection unless they have acquired a "secondary meaning" in the eyes of the public. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir.2002). Secondary meaning is defined as "the consuming public's understanding that the mark, when used in context, refers not to what the word ordinarily describes, but to the particular business that the mark is meant to identify." *Id. (quoting Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir.1990)). A plaintiff must show secondary meaning 1) in the defendant's trade area and 2) prior to the time that a defendant entered the market. *See id.* at 525 n. 10; *Perini*, 915 F.2d at

125–26. To establish secondary meaning, a plaintiff must prove that "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Proof of secondary meaning "entails a rigorous evidentiary standard." *U.S. Search*, 300 F.3d at 525. This is especially true when a party seeks to establish that initials pointing to the source of a product have acquired secondary meaning. *See G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 994 (7th Cir. 1989) (noting that "[t]here is a heavy burden on a trademark claimant to show an independent meaning of the initials apart from the descriptive words which are their source"). Six factors bear on the question of whether a party has established secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) sales success, (4) unsolicited media coverage, (5) attempts to plagiarize the mark, and (6) the length and exclusivity of the mark's use. *Id.* (citing *Perini*, 915 F.2d at 125; *Thompson Med. Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)). Of these factors, "[s]urvey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." *Id.* at 526 n. 13; *see also Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983).

■ Here, Plaintiff has failed to produce sufficient evidence that its descriptive "CNS" mark had acquired secondary meaning among a substantial number of present or prospective customers within MRC's trade area prior to MRC's launch of its CNSNews.com news wire in 1998. First, Plaintiff admits that it has engaged only in "minimal" advertising limited to Catholic trade publications. Plaintiff asserts that it has attended several secular conventions for journalists, but this hardly qualifies as extensive advertising, especially since the attendees at such conventions are journalists rather than the consuming public. After all, the Court undertakes this analysis to determine whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *U.S. Search*, 300 F.3d at 523. At best, attending conventions such as these could be considered advertising directed towards fellow journalists, but not toward prospective customers in any general sense.

Second, and most importantly, Plaintiff has no evidence of any consumer survey or study which sought to measure the extent to which, if at all, consumers associate the initials "CNS" with the type of news distribution services provided by Plaintiff. Although not dispositive of the Court's analysis, Plaintiff's failure to produce evidence of a survey or study measuring consumers' association of "CNS" with Plaintiff's product weighs heavily against a finding of secondary meaning. *See id.* at 526 n. 13.

Third, although Plaintiff cites to the Court impressive figures regarding its sales success, it remains unclear whether such success results from Plaintiff's use of the moniker "CNS." While Plaintiff's style book indicates that Catholic News Service writers should use "CNS" only as a second reference after "Catholic News Service," the style book also indicates that datelines should appear as: "WASHINGTON (CNS)." Plaintiff, however, lists itself in directories as "Catholic News Service," not as "CNS," and its web page bears the title "Catholic News Service" in large bold letters across the top, with secondary references to "CNS" in smaller type throughout the web page. Primarily, Plaintiff receives press passes issued to reporters working

for "Catholic News Service," although Plaintiff claims there have been six press passes identifying the news service only as "CNS." Plaintiff's publications contain both a byline and a dateline. Plaintiff's policy is to use "CNS" in the dateline and "Catholic News Service" in the byline. In short, Plaintiff sends mixed messages about whether it wishes to be identified as "Catholic News Service" or as "CNS." Thus, Plaintiff has not established that it has achieved significant sales success because of its use of "CNS."

Fourth, Plaintiff has identified no evidence of any unsolicited media coverage of Plaintiff's news service. Fifth, Plaintiff has identified no evidence that Defendant or another third-party sought to plagiarize Plaintiff's descriptive "CNS" mark. Finally, Plaintiff cannot claim that it has engaged in exclusive use of the initials "CNS." As noted earlier, there are a host of third-party uses and registrations of "CNS" for a range of goods and services. This includes several uses of "CNS" within the news distribution industry and even one third-party use which has issued press releases on stories of the day of interest to Catholics, thus falling directly within Plaintiff's scope of service. On balance, the Court finds that Plaintiff cannot meet the rigorous evidentiary standard for proving secondary meaning, a standard that is particularly intense when a party seeks to establish that initials pointing to the source of a product have acquired secondary meaning.

Plaintiff argues that the TTAB* found in its Order that Plaintiff's mark "CNS" is inherently distinctive and protectable. In so ruling, the TTAB relied heavily on the case of *Modern Optics, Inc. v. Univis Lens Co.* in which the former Court of Customs and Patent Appeals held that "initials cannot be considered descriptive unless they

have become so generally understood as representing descriptive words as to be accepted as substantially synonymous therewith." 43 C.C.P.A. 970, 234 F.2d 504, 506 (Cust. & Pat.App.1956). Plaintiff, however, ignores the fact that the TTAB, as it expressly acknowledged in its decision, was constrained to follow *Modern Optics* regardless of whether that case has received favorable treatment from other Courts of Appeals. In fact, courts in this Circuit have adopted the legal standard established in *Heileman* to determine whether trademarks consisting solely of initials qualify for protection under the Lanham Act. Even the case that Plaintiff cites as evidence that this Court relies upon the *Modern Optics* test for evaluating the protectability of initial marks in fact adopted the *Heileman* test and cited with approval other cases from the Seventh and Eleventh Circuits that did the same. *See Am. Online, Inc. v. AT & T Corp.,* 64 F.Supp.2d 549, 566 (E.D.Va. 1999), *aff'd in part and vacated in part,* 243 F.3d 812 (4th Cir.2001), *cert. dismissed,* 534 U.S. 946, 122 S.Ct. 388, 151 L.Ed.2d 256 (2001) (writing that "[i]t is well-settled that an abbreviation of a generic name that continues to convey to consumers the original generic connotation of the unabbreviated name is also generic."). As discussed above, since "Catholic News Service" is merely descriptive, the initials for that name are likewise merely descriptive and will receive protection only upon a showing of secondary meaning. For the reasons stated above, the Court finds that Plaintiff has not established secondary meaning for its descriptive mark, thus precluding its descriptive mark from protection.

**2. Plaintiff Has Failed to Demonstrate a Likelihood of Confusion**

■ Even if the Court were to find that Plaintiff's "CNS" mark has acquired sec-

---

* Editor's Note: Trademark Trial and Appeal Board

ondary meaning, the Court would grant Defendant's Motion for Summary Judgment because Plaintiff fails to show that there is a likelihood of confusion between Plaintiff's and Defendant's marks. In determining whether a plaintiff has demonstrated a likelihood of confusion, courts in this Circuit follow the factors set forth in *Pizzeria Uno Corp. v. Temple:* 1) the strength or distinctiveness of the plaintiff's mark; 2) the similarity of the two parties' marks; 3) the similarity of the goods and services that the marks identify; 4) the similarity of the facilities the two parties use in their businesses; 5) the similarity of the advertising used by the two parties; 6) the defendant's intent; and 7) actual confusion. 747 F.2d 1522, 1527 (4th Cir.1984). Of these factors, courts have held repeatedly that actual confusion is the most important. *See, e.g., Giant Brands, Inc. v. Giant Eagle, Inc.,* 228 F.Supp.2d 646, 654 (D.Md.2002) (citing *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir.2001). *De minimus,* theoretical, or anecdotal instances of alleged confusion cannot create a genuine issue of material fact to withstand summary judgment. *See CareFirst of Md., Inc. v. First Care, P.C.,* 350 F.Supp.2d 714, 725 (E.D.Va.2004).

### a. Plaintiff's Mark is Conceptually and Commercially Weak

■ The Court finds that Plaintiff's mark is conceptually and commercially weak. Even if a mark is valid and protectable, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods or services. *Lone Star Steakhouse,* 43 F.3d at 935. A mark's distinctiveness is directly related to the strength of the mark. *See Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 464 (4th Cir.1996). In assessing the distinctiveness of a trademark, a court must weigh 1) the conceptual strength of the mark, namely the placement of the con-

tested mark on the spectrum of marks; and 2) the commercial strength, or marketplace recognition of the mark. *See Sterling Acceptance Corp. v. Tommark, Inc.,* 227 F.Supp.2d 454, 461 (D.Md.2002), *aff'd* 91 Fed.Appx. 880 (4th Cir.2004). Courts also must examine third-party usage, consumer confusion, and the extent of secondary meaning a mark has acquired in the eyes of consumers. *See Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997). "Numerous users of a mark strongly indicate a weak mark." *CareFirst,* 350 F.Supp.2d at 722; *see Petro Stopping,* 130 F.3d at 93–94. "The frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry" especially when the number of third-party registrations is great. *Petro Stopping,* 130 F.3d at 93 (*citing Pizzeria Uno,* 747 F.2d at 1530–31).

Here, Plaintiff's mark qualifies at the lower end of the spectrum, as it is "descriptive." Furthermore, under the second prong of the distinctiveness test, Plaintiff's mark has little commercial strength and marketplace recognition. Many companies in the news distribution business use "CNS," "CNS News," or similar marks to identify themselves and the source of their products and services. At least one of these organizations has reported on news stories from a Catholic perspective, a service identical to that which Plaintiff provides, under the abbreviation "CNS." Also, at least thirty-five applications have sought trademarks consisting of the letters "CNS." Plaintiff's mark, already relatively weak because of its location on the low end of the distinctiveness spectrum, has been further diluted by significant third-party usage, including third-party usage in Plaintiff's exact line of business. Plaintiff cannot establish that a significant percentage of the con-

suming public understands Plaintiff's initials as a signifier for "Catholic News Service." *See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 498 (E.D.Va.1999). Thus, the Court finds that the first *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**b. The Parties' Marks are Not Confusingly Similar**

The Court finds that the parties' marks are not confusingly similar. Courts must determine "whether there exists a similarity in appearance and sound which would result in confusion." *Petro Stopping,* 130 F.3d at 94. In considering this factor, courts look at each mark in its entirety, giving greater force and effect to the marks' dominant elements. *See Washington Speakers,* 33 F.Supp.2d at 498.

Here, the parties' marks differ in appearance and sound, as well as in their overall commercial impressions. Although Plaintiff asserts that the Court must consider USSCB's use of "CNS" with Defendant's use of "CNS," Plaintiff offers no evidence that Defendant uses "CNS" except in its metatags. Instead, Defendant uses its trademarks CNSNEWS.COM– CYBERCAST NEWS SERVICE, with and without the registered design format, as well as CNSNews.com when feasible on its website, in its article by-lines, to identify reporters, and in its marketing materials. These marks clearly differ from Plaintiff's claimed "CNS" mark in sound, sight, and overall appearance. Even if the Court were to analyze these marks by comparing Plaintiff's "CNS" with Defendant's "CNSNews" or "CNSNews.com," there is a sufficient difference between the marks. The law does not demand that a company not use a mark similar to another mark, but instead requires that the marks not create confusion. Even if the Court analyzed "CNSNews" or "CNSNews.com,"

there is a difference in sound, sight, and appearance between those marks and "CNS" so that the second *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**c. The Parties' Services are Sufficiently Dissimilar**

The Court finds that the parties' services are sufficiently dissimilar. Under the third *Pizzeria Uno* factor, courts analyze whether the parties offer distinct products to different markets. *See Yellowbrix, Inc. v. Yellowbrick Solutions, Inc.,* 181 F.Supp.2d 575, 580 (E.D.N.C. 2001).

Here, the parties both provide news services. Furthermore, there have been occasions where both parties have covered similar stories or issues. However, Plaintiff is part of the "Catholic press," reporting on stories of interest to Catholics if not exclusively about the Catholic church. Its customers consist primarily of Catholic diocesan publications. Plaintiff, on the other hand, is part of the secular press and reports on stories of interest to the general population. Although both parties are technically providers of news, the Court finds that the parties do not provide identical services. Thus, the third *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**d. Plaintiff Cannot Prove that the Parties' Channels of Trade are Similar**

The Court finds that the parties' facilities and channels of trade are sufficiently dissimilar. "[B]ecause the Internet has become such a prevalent channel of trade, the probativeness of this factor is somewhat diminished in determining whether there is a 'likelihood of confusion' amongst consumers of the parties' products." *Yellowbrix,* 181 F.Supp.2d at 579.

Here, Plaintiff asserts that the channels of trade through which the parties distrib-

ute their services are identical because both parties use web pages and articles republished on third-party websites. However, the court in *Yellowbrix* explicitly stated that comparing companies who market their services on the Internet dilutes the argument that the parties' channels of trade were similar. Because Plaintiff here only points to similar techniques used by the parties through Internet marketing, the Court finds insufficient evidence to prove that the parties have used similar channels of trade. Consequently, the fourth *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**e.   There are No Similarities in the Parties' Advertising Methods**

The Court finds that the parties' methods of advertising are sufficiently different. Plaintiff's "minimal" advertising is limited to Catholic trade publications. Defendant does not advertise in such publications. Instead, Defendant uses "earned media," unsolicited mentions of Defendant and its news service on nationally-syndicated radio and television programs, to generate consumer awareness for its news service. Plaintiff's only reference to the difference in the parties' advertising methods is a bald assertion in its brief that "[t]here are differences with respect to this factor." Such a conclusory statement does not suffice to establish a triable issue of fact as to this factor. Consequently, the Court finds that the fifth *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**f.   Defendant Adopted its Mark in Good Faith**

The Court finds that Defendant adopted its trademark in good faith with no intent to trade on Plaintiff's goodwill. A defendant's intent can suggest a likelihood of confusion only if the defendant adopted its mark with the intent "to 'pass off' its prod-

uct as that of another." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980).

Here, the only evidence provided by Plaintiff about Defendant's intentions is MRC's President's admission that he had heard of the Catholic News Service at the time that Defendant decided to use CNSNews.com. Such an admission does not address the central question of whether Defendant adopted its trademark to infringe upon Plaintiff's mark and trade on its goodwill. Because Plaintiff does not offer any evidence that Defendant adopted its mark in bad faith, the Court finds that the sixth *Pizzeria Uno* factor weighs in favor of granting Defendant's Motion for Summary Judgment.

**g.   Plaintiff Fails to Demonstrate Actual Confusion Among an Appreciable Number of Typical Consumers**

The Court finds that Plaintiff fails to demonstrate actual confusion among an appreciable number of typical consumers. Relevant confusion is that which affects the purchasing and selling of the goods or services in question. *See Sterling Acceptance,* 227 F.Supp.2d at 464. "Trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Id.* Where the volume of commerce is huge and a party presents only meager evidence of actual confusion, the evidence is, at best, *de minimus. Petro Stopping,* 130 F.3d at 95. The number of instances of actual confusion must be considered in the context of the number of opportunities for confusion in determining how to weigh the evidence. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:14.

Here, the parties have engaged in concurrent use of their respective trademarks for the past five and one half years. Dur-

ing that time, Defendant's website has received more than 82 million visitor sessions, and CNSNews.com has produced over 20,000 news articles. Plaintiff, likewise, has received four to five thousand visitors per day, and millions per year, to its web site. The total annual circulation of its clients' publications also reaches the millions, and Plaintiff has produced news articles numbering in the tens of thousands. Despite all of this activity, Plaintiff points to, at most, seven instances of alleged actual confusion.

The first alleged instance of confusion concerns an e-mail forwarded on May 17, 2002, originally sent by Matt Daniels, the Executive Director of the Alliance for Marriage, an organization that lobbies in favor of a Constitutional amendment defining marriage as being between a man and a woman. This was the subject matter of the article in question. The second alleged instance of confusion concerns a July 17, 2002 e-mail from Peter Droege. Mr. Droege complained to the Catholic News Service that "I have followed the discussion about cloning humans and was appalled by the article below from CNS." The article that Mr. Droege cited came from MRC's CNSNews.com. Plaintiff's third instance comes from a printout of a third party website with a story written by CNSNews.com, but with a byline of "Catholic News Service." Plaintiff's fourth alleged instance of confusion took place on the same third party website wherein a CNSNews.com article had CNSNews.com in the dateline, CNSNews.com in the acknowledgment section, but the quotation "Bruce Sullivan is a Staff Reporter with Catholic News Service" in the author section. Plaintiff's fifth instance of confusion comes from an e-mail to Mark Lombard from the International Desk of the news service advising that it had received a call "from someone concerned about correspondence they had received from a Scott Hogenson. The person assumed it was us, but I told him that CNSNews.com was not us, and that there was an ongoing legal battle about the name." Plaintiff's sixth incident of confusion is reflected in an e-mail exchange between Julie Asher, National Editor of the Catholic News Service and Mark Lombard. In the e-mail, Ms. Asher reported that CNS had received "two calls from people looking for a story we did, but they really wanted CNSNews.com." Plaintiff's seventh and final alleged instance of confusion resulted from several postings on a blog. One poster on the blog identified an article from CNSNews.com. Another poster on the blog responded in relevant part by writing, "[w]ho is CNS.com? It's the Catholic News Service."

The Court finds that such examples are merely anecdotal examples of confusion and thus qualify as *de minimus*. *See CareFirst*, 350 F.Supp.2d at 725 (granting summary judgment in a case with confusion as to only two (2) out of one hundred thirty (130) individuals because such evidence was *de minimus*); *Sterling Acceptance*, 227 F.Supp.2d at 465 (holding that ten instances of confusion when each of the parties engaged in a large volume of commerce over a long period of time qualified as *de minimus*). Over the past five and a half years, there have existed millions of opportunities for confusion, and Plaintiff can point to only seven possible instances of confusion, some of which are incredibly weak. This cannot create a triable issue of fact as to actual confusion between the parties' services. *See, e.g., Door Sys. Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir.1996) (writing that "evidence that two customers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion").

**630**

Therefore, the Court grants Defendant's Motion for Summary Judgment because Defendant cannot prove a likelihood of confusion based on any of the *Pizzeria Uno* factors.

## III. CONCLUSION

The Court grants Defendant's Motion for Summary Judgment because Plaintiff's trademark is merely descriptive and thus not protected under the Lanham Act without evidence of secondary meaning, and Plaintiff cannot show a likelihood of confusion between Plaintiff's and Defendant's marks.

Accordingly, it is hereby

ORDERED that Defendant Media Research Center's ("MRC") Motion for Summary Judgment is GRANTED.

The Clerk is directed to forward a copy of this Order to counsel of record.

### *FINAL JUDGMENT*

THIS MATTER is before the Court on Defendant Media Research Center's ("MRC") Motion for Summary Judgment. In its previous Memorandum Order of May 12, 2006, the Court granted Defendant's Motion for Summary Judgment. From the foregoing, it is hereby

ORDERED that JUDGMENT is ENTERED in favor of Defendant Media Research Center ("MRC") and against Plaintiff United States Conference of Catholic Bishops.

The Clerk is DIRECTED to ENTER JUDGMENT pursuant to Federal Rule of Civil Procedure 58.

The Clerk is directed to forward a copy of this Order to Counsel.